**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

|  |  |
|---|---|
| In re:<br><br>CRIMSONBIKES, LLC<br><br>        Involuntary Debtor | Chapter 7<br><br>Case No. 21-10278 (JEB) |

**AFFIDAVIT OF DAVID P. WERT IN SUPPORT OF OBJECTION
TO MOTION TO DISMISS INVOLUNTARY PETITION**

I, David P. Wert, hereby declare under penalty of perjury:

1.      I am the General Manager of SmartEtailing, Inc. ("SmartEtailing"), and have held that position for approximately four years. In that capacity, I am generally responsible for overseeing a team of employees at SmartEtailing that originate and manage SmartEtailing's business relationships with the bicycle product retailers that hire SmartEtailing to create and host their web-sales platforms. On a daily basis, I also manage and am intimately familiar with SmartEtailing's relationships with third-party technology providers, and all financial aspects of the SmartEtailing business model.  I am also the keeper of the business records that relate to these aspects of the SmartEtailing business.

2.      I have personal knowledge of the intricacies of SmartEtailing's business relationship with CrimsonBikes, LLC ("Crimson"), and submit this Affidavit in support of the contemporaneously filed *Objection* of SmartEtailing and the remaining petitioning creditors in the above captioned involuntary bankruptcy ("Objection") to Crimson's *Motion to Dismiss and Request for Costs, Fees and Damages, or in the Alternative, Convert the Chapter 7 Case to One Under Chapter 11 of the United States Bankruptcy Code.*

3.      Generally, SmartEtailing is in the business of providing tools and services for hundreds of small, locally owned and operated retail bike shops to build and maintain e-commerce websites and grow sales.

4.      As part of its suite of services, SmartEtailing offers retailers the ability to accept credit card payments from consumers on their websites without having to establish a separate merchant account with Visa, American Express, and MasterCard ("Issuers") through a proprietary native payment gateway called SmartEtailing Payments ("SE Payments").[1]

5.      SmartEtailing, in turn, contracts with Stripe, Inc. ("Stripe") to receive a license to use those of Stripe's code, infrastructure, and PCI compliance tools that are integrated in the SmartEtailing web platform to facilitate the SE Payments service for SmartEtailing customers under a Stripe Service Agreement; Stripe also provides certain payment processing services on SmartEtailing's behalf.

6.      When a retailer signs up for SE Payments, they must execute a contract with Stripe (the "Connected Account Agreement")[2] and connect an active bank account with Stripe to both settle consumer transactions (deposit funds received from credit card companies into the retailer's account) and fund debit payments back to Stripe for any refunds, disputed transactions (known as chargebacks) and fees related to the consumer transactions submitted by the retailer.  The retailer must also give SmartEtailing permission to access funds in a Connected Account.

7.      Separately, the contract between Stripe and SmartEtailing requires SmartEtailing to have a bank account linked to Stripe (the "SmartEtailing Account").  The SmartEtailing Account primarily serves to settle and receive monthly subscription payments from SmartEtailing's customers, less any debits for monies owed by SmartEtailing under the Stripe Services Agreement.

---

[1] More information about SmartEtailing's business can be found on its website, at www.smartetailing.com.
[2] A copy of the Connected Account Agreement is available at https://stripe.com/connect-account/legal.

It also serves to provide Stripe with a primary account to settle transactions initiated by the various retailers on the SmartEtailing Payments platform.

8.      Crimson is a bicycle and bicycle accessories retailer with a brick and mortar store located in Cambridge, Massachusetts that hired SmartEtailing in approximately August, 2016 to assist it in launching an on-line sales platform and expanding its sales beyond Massachusetts, pursuant to an End User License Agreement signed on or about August 22, 2016, as later amended in January, 2018. ("<u>Crimson Agreement</u>" or "<u>EULA</u>")(*See Exhibit A*.)   The Crimson website launched in 2017.  Subsequently, in early 2019, Crimson requested that SmartEtailing include the SE Payments function on the Crimson website designed and hosted by SmartEtailing through the Crimson Agreement.

9.      Accordingly, on or around March 21, 2019, Crimson signed a "Connected Account" agreement with Stripe, and linked an account then-maintained with Cambridge Trust Company (as successor to Ally Bank) to SmartEtailing's master collection account with Stripe for disbursement by SmartEtailing to Crimson of credit card receipts generated from sales through Crimson's web platform ("<u>Crimson Account</u>").

10.      By April, 2020, SmartEtailing observed that Crimson had a higher rate of customer dispute ("<u>Dispute Rate</u>") than the .08% ("<u>Threshold</u>") that is considered customary and appropriate for retailers and other SmartEtailing merchants using thresholds that are established in the first instance by the Issuers and enforced by Stripe on all platform providers (like SmartEtailing) and merchants (like Crimson).  On May 5, 2020, SmartEtailing, through Paul Ribich, Client Success Director, sent an email to Charles James of Crimson informing Mr. James that Crimson's SE Payments fees would increase if the Dispute Rate continued to exceed the Threshold; follow-up emails were sent on June 18, 2020 and June 22, 2020.  *See Exhibit B*.

11.     Instead of dropping, Crimson's Dispute Rate increased through July, 2020, due, in large part, to customers that had placed on-line orders, paid for products, and never received deliveries. Eventually, as Crimson's Dispute Rate continued to exceed the Threshold due to Crimson's failure to timely delivery products, which put SmartEtailing's business relationship with Stripe for the benefit of all of its retailers in jeopardy, SmartEtailing informed Crimson through an email dated July 30, 2020 that Crimson would no longer have access to SE Payments as of August 31, 2020. *See Exhibit C.*   SmartEtailing, though, offered to assist Crimson in transitioning to a replacement payment processing vendor. SmartEtailing also provided Crimson a spreadsheet that listed all of Crimson's sales and refund transactions from January 1, 2020 through June 30, 2020. *Id.*

12.     SmartEtailing later agreed to extend the August 31, 2020 transition date to September 3, 2020, and then again to September 9, 2020, at the request of Mr. James.  During this entire time period and through October 27, 2020, Crimson had the unfettered ability to download a report listing all of its previous sales transactions with its Point of Sale website features.  *See Exhibit D.*

13.     Crimson moved its sales platform to one sponsored by Shopify.com on or about October 8, 2020 and prior to that, on or about September 28, 2020, replaced the Crimson Account with an <u>unfunded</u> bank account in Crimson's name set up at Bank of America ("Unfunded Account").

14.     After disconnecting the original, funded Crimson Account, Crimson used the SmartEtailing platform to issue credit card refunds to approximately 646 of Crimson customers over a 30 day period ("Refunds") yet did not place any funds in the Unfunded Account to cover those Refunds. By the end of October, 2020, the amount of the Refunds authorized by Crimson

through the SmartEtailing platform was approximately $318,645. Crimson refused to place money in the Unfunded Account in order to cover the Refunds, despite requests. *See Email dated October 19, 2020, Exhibit E.*

15.    Meanwhile, Crimson's customers continued to dispute the charges paid to Crimson and requested credit-card "chargebacks" from issuing banks (of the customers disputing charges) when they did not receive refunds ("<u>Chargebacks</u>"). As of approximately October 27, 2020, the deficit in the Unfunded Account amounted to $372,502.74 on account of Refunds and Chargebacks relating to incomplete sales ("<u>Customer Charges</u>").

16.    Because Crimson's failure to link a properly funded bank account to the SmartEtailing platform to cover the cost of Customer Charges violated the text and spirit of the EULA and Crimson failed to make a promised deposit to the Unfunded Account, on or about October 27, 2020, SmartEtailing disabled access to Crimson's "Site Manager," a function that enabled Crimson to control how its website was configured externally and to issue refunds and process orders.  Prior to that date, though, Crimson could have easily created reports of all transactions or automatically exported them to their own system if Crimson wanted to identify which consumers had purchased bicycles, received refunds, or requested chargebacks.

17.    As of November 13, 2020, the Unfunded Account had a negative balance of approximately $394,490 on account of Customer Charges. SmartEtailing attempted to negotiate terms for reimbursement by Crimson of the Customer Charges by both inside and outside counsel in November through December 23, 2020. As part of those negotiations, SmartEtailing provided Mr. James of Crimson with a list of all transactions processed through SE Payments in 2020.  On December 3, 2020, SmartEtailing also permitted Crimson to again access the Site Manager and the sales information contained therein upon request of Crimson believing that this would enable

Crimson to more easily issue refunds directly to those customers that had elected to cancel their orders. Those negotiations failed and SmartEtailing initiated litigation against Crimson in the Minnesota District Court on or about December 23, 2020.

18.     SmartEtailing later learned from reading the "notes" created by Crimson employees for certain sales in Crimson's Site Manager, as well as upon review of the numerous complaints filed with the Better Business Bureau on-line, that instead of issuing refunds from its operating account, Crimson was contacting disgruntled consumers and instructing them to seek chargebacks from the issuing credit card company that would be processed through the Unfunded Account. Upon information and belief, Charles James of Crimson even provided certain consumers with a letter from Crimson to include with their disputes. This practice caused a notable increase from 95 credit card disputes requested in November, 2020, to 188 in December, 2020 and another 201 in January, 2021, with the balance of unfunded Customer Charges growing to $612,149.06 by January 31, 2021.

19.     As merchant, Crimson was required under the EULA and the Stripe Connected Agreement to maintain a sufficient amount on deposit to cover the cost of any refund and credit card chargebacks processed in favor of Crimson's customers.  When Crimson defaulted on that obligation, SmartEtailing had no way to withdraw funds from Crimson's Unfunded Account and was forced to cover the refunds and chargebacks from its own Platform account.  These funds would otherwise have been available to SmartEtailing.  A diagram that I prepared summarizing the steps involved with the flow of funds through SE Payments and Stripe, leading to payment by SmartEtailing, is attached as *Exhibit  F*.

20.     As of May 5, 2021, the Customer Charges paid by SmartEtailing on Crimson's behalf totaled $693,132.21.  The Customer Charges represent amounts paid by SmartEtailing to

approximately 1,407 of Crimson's customers in refunded charges for bikes that were paid for but not delivered. This amount is increasing daily as additional customers dispute credit card charges. *Crimson, however, has received all of the amounts paid by its customers at the original time of order using credit cards through SE Payments so should have had the funds needed to either deposit funds in the Unfunded Account or issue refunds directly to its customers (and then dispute their chargebacks on the basis that a refund had been issued, as is typical practice).*

21.    In addition, Crimson is obligated to reimburse SmartEtailing for the fees charged by Stripe totaling approximately $14,674.31, and $67,228.82 in fees charged by Visa, MasterCard, American Express and Discover to process the Customer Charges. Finally, Crimson owes SmartEtailing approximately $8,960 for service and subscription fees due under the EULA for continued hosting services to Crimson, including in connection with credit card chargeback activities for pre-September, 2020 sales, as evidenced by the invoices attached at *Exhibit G*.

22.    The entire amount owing to SmartEtailing as of May 5, 2021 is approximately $783,995.35 ("Crimson Charges"), exclusive of attorneys' fees and costs incurred by SmartEtailing to date.

23.    After conducting diligence regarding the high number of consumer complaints that were made to the Better Business Bureau and the Attorney General's office in Massachusetts in 2021, and after learning that Crimson is a named defendant in numerous litigation matters, I recommended that SmartEtailing work with other creditors to initiate an involuntary bankruptcy case, as it did not appear that Crimson was taking any meaningful action to repay the debt that it had accrued in any forum.

24.    At no point prior to filing the Motion to Dismiss did Crimson assert to SmartEtailing that SmartEtailing breached the EULA, or dispute that the Customer Charges are obligations of Crimson.

SIGNATURE PAGE TO FOLLOW

Signed this 18th day of May, 2021, under the pains and penalties of perjury.

_____
David P. Wert

## **EXHIBIT A**

# WEB HOSTING AND SOFTWARE LICENSE AGREEMENT (rev. 11/29/2018)

This Web Hosting and Software License Agreement, hereinafter referred to as "Agreement," is entered into by and between SmartEtailing, Inc., hereinafter referred to as "SmartEtailing," and you, hereinafter referred to as "Subscriber."

## Recitals

A. SmartEtailing is a provider of website internet services.

B. Subscriber is an individual or entity engaged in business and desiring to contract with SmartEtailing for the purpose of establishing a website and utilizing related services offered by SmartEtailing, as set forth in this Agreement.

NOW, THEREFORE, in consideration of their mutual promises set forth in this Agreement, and for good and valuable consideration, SmartEtailing and Subscriber agree as follows:

## 1.0. EFFECTIVE DATE

This Agreement shall be effective for all purposes (Effective Date) as of the date Subscriber electronically transmits to SmartEtailing Subscriber's agreement to be bound by the terms and conditions hereof. Such transmission is accomplished by clicking the button so indicating at the end of this Agreement.

## 2.0. EXPLANATION OF TERMS

As used in this Agreement, the following terms shall have the meanings set forth below:

## 2.1. Activation Date.

The "Activation Date" shall be the date SmartEtailing provides Subscriber a user identification and password to access the SmartEtailing Services, enabling Subscriber to access the SmartEtailing server and upload Subscriber Content.

## 2.2. Subscriber Website.

"Subscriber Website" means the website provided to Subscriber by SmartEtailing pursuant to this Agreement.

## 2.3. Subscriber Content.

"Subscriber Content" means any and all images, artwork, copy, information (including, without limitation, information in any file in any format), data, knowledge, computer software, and other materials of any kind provided by Subscriber for use with Subscriber's Website.

## 2.4. Library Materials.

"Library Materials" shall mean any and all proprietary images, artwork, copy, information, data, or knowledge licensed to Subscriber hereunder as part of the SmartEtailing Services. The Library Materials shall consist of Materials located or originating from the administrative areas of Subscriber's Website, FTP site provided by SmartEtailing, or web services URL's provided for content syndication, where applicable. SmartEtailing reserves the right to modify, remove, or add to the list of Library Materials available to Subscriber at any time.

## 2.5. SmartEtailing Tools.

"SmartEtailing Tools" means the computer software and other materials, including HTML script or code, developed by SmartEtailing or its suppliers, and provided under this Agreement for the use of

Subscriber to create, maintain, update and upgrade Subscriber's Website. SmartEtailing reserves the right to modify, remove, or add to the list of SmartEtailing Tools available to Subscriber at any time.

## 2.6. SmartEtailing Proprietary Materials.

"SmartEtailing Proprietary Materials" means the Subscriber Website, Library Materials, and SmartEtailing Tools, which are owned by SmartEtailing.

## 2.7. SmartEtailing Services.

"SmartEtailing Services" means the services to be provided by SmartEtailing to Subscriber as set forth in the part of this Agreement entitled "SmartEtailing Services."

## 3.0. SMARTETAILING SERVICES

## 3.1. Hosting Services.

During the term of this Agreement, SmartEtailing shall host the Subscriber Website on SmartEtailing servers.

## 3.2. SmartEtailing Proprietary Materials.

SmartEtailing shall provide Subscriber use of the SmartEtailing Proprietary Materials, strictly in accordance with the license granted herein, for the sole purpose of creating, maintaining, updating and upgrading the Subscriber Website. Subscriber agrees that it does not own the SmartEtailing Proprietary Materials and shall make no claim of such ownership.

## 3.3. No Subscriber Internet Connection Equipment Provided.

SmartEtailing does not provide any modem, computer, or any other equipment or system for Subscriber to connect to the Internet. Subscriber is responsible for its modems, computers, operating systems and connection devices necessary for connecting to the Internet through which Subscriber can access the SmartEtailing Services.

## 3.4. Revision of SmartEtailing Services.

SmartEtailing may modify, suspend or discontinue any aspect of the SmartEtailing Services at any time, including the availability of any SmartEtailing Proprietary Materials. SmartEtailing may also impose limits on certain features and services or restrict Subscriber's access to parts or all of the SmartEtailing Services without notice or liability of any kind.

## 3.5. No Resale of SmartEtailing Services.

Subscriber agrees that this Agreement is personal to Subscriber and that Subscriber may not resell, lease, license, assign or redistribute any portion of the SmartEtailing Services to any third party.

## 3.6. Technical Support.

SmartEtailing shall provide technical support to Subscriber which shall consist, at a minimum, of on-line help instructions relating to use by Subscriber of SmartEtailing Proprietary Materials. Some levels of service may have access to additional types of support at SmartEtailing's sole discretion.

## 4.0. FEES AND PAYMENT.

## 4.1. Fees.

Initial setup and monthly fees for use of the SmartEtailing Services have been previously provided to Subscriber, and are incorporated in this Agreement by reference and made a part hereof.

## 4.2. Payment.

SmartEtailing's initial setup fees are to be paid in advance of Subscriber's account being activated. SmartEtailing's monthly billing cycle corresponds to calendar months and commences upon the Activation Date of Subscriber's Website. All billing will be charged to Subscriber's credit card or bank account. SmartEtailing will charge Subscriber monthly in advance for its Services. On Subscriber's first bill, Subscriber will be charged for that portion of the month in which Subscriber's monthly billing cycle began. Monthly, thereafter, SmartEtailing will charge Subscriber's credit card or bank account the monthly fee for the new month, plus other charges authorized by this Agreement, if any.

## 4.3. Fee Changes.

SmartEtailing fees may vary from time to time. SmartEtailing reserves the right to change its fees at any time provided, however, that, whenever possible, SmartEtailing will give Subscriber reasonable notice of such change. From time to time, SmartEtailing may add or modify certain services related to the SmartEtailing Services, and SmartEtailing reserves the right to charge Subscriber additional or different fees in consideration for providing such new or modified services to Subscriber.

## 4.4. Payment Default.

In the event Subscriber's payments are declined for any reason, Subscriber will be deemed to be in default and in material breach of this Agreement. In such event, SmartEtailing may, in its sole discretion, (a) charge Subscriber a late fee during each month that payment in full is not made and/or (b) terminate this Agreement in accordance with the termination provisions below. In the event

SmartEtailing resorts to legal action to recover monies due, Subscriber agrees to reimburse SmartEtailing for all costs and expenses incurred to recover such monies, including reasonable attorneys' fees.

## 5.0. TERM AND TERMINATION.

## 5.1. Term.

This Agreement shall commence as of the Effective Date and shall be effective until terminated as provided below.

## 5.2. Termination.

### 5.2.1. Termination by Subscriber.

Subscriber may terminate this Agreement by written notice to SmartEtailing. Termination shall be effective 30 days following receipt of the written notice by SmartEtailing.

### 5.2.2. Termination by SmartEtailing.

SmartEtailing may terminate this Agreement at any time by notice to Subscriber, conveyed via telephone, facsimile or transmitted electronically. Termination shall be effective at the end of the current billing cycle unless stated otherwise in the termination notice.

## 5.3. Effect of Termination.

## 5.3.1. Subscriber Charges.

In the event Subscriber terminates this Agreement within 30 days of the Activation Date, SmartEtailing shall discontinue all billings and refund to Subscriber all funds received by SmartEtailing on Subscriber's account. If Subscriber terminates this Agreement at any time after 30 days following the Activation Date, the setup fee and any monthly fees for SmartEtailing Services rendered by SmartEtailing shall be nonrefundable, but SmartEtailing shall discontinue further billings per Section 5.2.2.

## 5.3.2. Subscriber to Cease Use of SmartEtailing Proprietary Materials.

Upon the termination of this Agreement, all rights of Subscriber under this Agreement shall terminate and all rights of Subscriber under the license granted in this Agreement shall automatically revert to SmartEtailing. Subscriber shall immediately discontinue the use of the SmartEtailing Proprietary Materials and thereafter shall no longer use or have the right to use the SmartEtailing Proprietary Materials or any variation or simulation thereof, or any word or trademark similar thereto, or to directly or indirectly develop, create, market, distribute, sell, license or sublicense, or advertise any products and/or services in connection with the SmartEtailing Proprietary Materials. Upon the termination or expiration of this Agreement, Subscriber shall provide SmartEtailing with written certification that Subscriber has destroyed any and all material upon or in which SmartEtailing Proprietary Materials are contained, affixed, or used. Subscriber acknowledges that Subscriber's failure to cease the use of the SmartEtailing Proprietary Materials upon termination or expiration of this Agreement shall result in immediate and irremediable damage to SmartEtailing. Subscriber acknowledges and admits that there is no adequate remedy at law for such failure, and agrees that in the event of such failure,

SmartEtailing shall be entitled to equitable relief by way of temporary and permanent injunction and such other and further relief as any court with jurisdiction may deem just and proper.

## 6.0. SOFTWARE LICENSE.

## 6.1. Grant of License by SmartEtailing.

SmartEtailing hereby grants to Subscriber, and Subscriber hereby accepts, a personal, non-transferable, non-exclusive, limited license, for the term of this Agreement, to use one (1) copy of the SmartEtailing Proprietary Materials solely in connection with operating the Subscriber Website (the "SmartEtailing License"). Nothing herein shall be construed to be, and SmartEtailing does not grant to Subscriber, any right or license in any SmartEtailing proprietary images, artwork, copy, information, data, knowledge, computer software or any other material or information of any kind exclusive of this limited license to the SmartEtailing Proprietary Materials.

## 6.2. No Sublicense.

Nothing herein shall be construed to be, and SmartEtailing does not grant to Subscriber, any right or license to enter into sublicenses or distribution agreements with respect to any portion of the SmartEtailing Proprietary Materials.

## 6.3. Ownership.

The SmartEtailing Proprietary Materials are owned by SmartEtailing. The SmartEtailing License confers no title or ownership in the SmartEtailing Proprietary Materials and is not a sale of any rights in the SmartEtailing Proprietary Materials.

## 6.4. Copyright Notices.

The SmartEtailing Proprietary Materials are protected by copyright pursuant to U.S. copyright laws, international conventions and other copyright laws, and are owned or controlled solely by SmartEtailing. [MM1] Subscriber shall abide by any and all additional copyright notices, information, or restrictions contained in the SmartEtailing Proprietary Materials.

## 6.5. SmartEtailing License Restrictions.

Except as expressly permitted in this Agreement, Subscriber represents, warrants and covenants that Subscriber shall not reproduce, modify, publish, transmit, participate in the transfer or sale of, distribute, publicly exhibit, or in any way exploit, any of the SmartEtailing Proprietary Materials, in whole or in part.

## 6.6 No Decompilation, Etc.

Subscriber represents, covenants, and warrants that it shall not, itself or as the agent or employee of any other person, directly or indirectly, commit, cause, or contribute to the reverse engineering, decompilation, or translation of, or development of derivative works based on, the SmartEtailing Proprietary Materials.

## 6.7. No Contesting of Rights.

Subscriber acknowledges and agrees that neither during the existence of this Agreement nor after the termination or expiration hereof, shall Subscriber directly or indirectly claim, contest or aid in claiming or contesting the validity or ownership of the SmartEtailing Proprietary Materials or take any action

whatsoever in derogation of SmartEtailing's rights therein or in breach of any terms and conditions contained in this SmartEtailing License.

## 6.8 Reservation of Rights.

Any and all rights to use any SmartEtailing Proprietary Materials not expressly granted to Subscriber under this Agreement are hereby reserved to SmartEtailing (the "SmartEtailing Reserved Rights"). Nothing contained in this Agreement shall affect, impair, or limit in any way SmartEtailing's rights to exploit fully any or all of the SmartEtailing Reserved Rights.

## 6.9. SmartEtailing Trademarks.

Nothing herein shall be construed to be, and SmartEtailing does not grant to Subscriber, any right or license in any SmartEtailing trademark, tradename, service mark, insignia, slogan, name, emblem, logo, symbol, design and/or other identifying characteristics owned by or associated with SmartEtailing, in any manner whatsoever.

## 6.10. Grant of License by Subscriber.

Subscriber hereby grants to SmartEtailing a perpetual, non-exclusive license to reproduce, license, publish, distribute, transmit, broadcast, or publicly exhibit, display, perform or digitally perform and otherwise use the Subscriber Content as necessary to provide the SmartEtailing Services to Subscriber hereunder. Subscriber hereby agrees to now and forever release, indemnify, defend and hold harmless SmartEtailing, its affiliates, subsidiaries, directors, officers, advertising agencies, suppliers, agents and employees, from any and all losses, damages, rights, claims and actions with respect to, or in any way arising from, the Subscriber Content or SmartEtailing's use of the Subscriber Content (including, without limitation, any alleged or actual infringement of any proprietary rights,

rights of privacy and publicity, moral rights, and rights of attribution in connection with the Subscriber Content).

## 6.11. Proprietary Rights.

Subscriber acknowledges and agrees that SmartEtailing owns and shall retain all rights, title and interest in and to the SmartEtailing Proprietary Materials, including, without limitation, all copies thereof and all rights to patents, copyrights, trademarks, service marks, trade secrets and other intellectual property rights inherent therein and appurtenant thereto. Subscriber shall retain all rights, title and interest in and to the Subscriber Content, including, without limitation, all copyrights, trademarks, patents, trade secrets, and any other proprietary rights inherent therein or appurtenant thereto.

## 7.0. Subscriber Responsibilities.

Subscriber agrees that:

## 7.1.

Subscriber shall comply with all international, federal, state, and local laws and regulations applicable to Subscriber's use of the SmartEtailing Services and/or operation of the Subscriber Website.

## 7.2.

Subscriber shall display, advertise, and offer for sale on the Subscriber Website only products Subscriber is contractually or otherwise lawfully authorized to display, advertise, or offer for sale. If SmartEtailing is informed that Subscriber is not an authorized user of product content, is not an authorized seller of products, or is otherwise in violation of vendor sales policies with respect to

products, Subscriber agrees that SmartEtailing may in its complete discretion take any action it deems appropriate, including removal of product postings or terminating this Agreement.

## 7.3.

SmartEtailing services and content licenses will only be made available to businesses that have brick-and-mortar commercially zoned retail storefronts. Subscriber shall at all times display on subscriber's website a reasonably noticeable reference to subscriber's retail store location(s). Such reference shall include at a minimum, a complete street address, phone number, hours of operation, and retail store name (DBA) if different than subscriber's website branding.

## 7.4.

Subscriber shall establish Subscriber's own privacy and other policies in relation to Subscriber's web customers, shall make such policies known to its customers, and shall adhere to such policies.

## 7.5.

Subscriber shall, in a timely, professional, business-like, and competent manner, monitor customer orders placed through use of the Subscriber Website, respond to such orders, ship merchandise ordered, and perform all customer-service-related tasks.

## 7.6.

Subscriber shall be solely responsible for all taxes and bank issues related to e-commerce conducted by Subscriber on the Subscriber Website, and SmartEtailing shall not be responsible for any taxes or fees Subscriber may incur.

## 7.7.

Subscriber shall be solely responsible for maintaining the confidentiality of Subscriber's password and shall be liable for, and shall defend and hold SmartEtailing harmless from, any harm from disclosing or allowing disclosure of any password or from use by any person of Subscriber's password to gain access to Subscriber's account.

## 7.8.

SmartEtailing shall take commercially reasonable measures to protect Subscriber's data, files, email and other information that SmartEtailing holds in computer storage, but cannot guarantee that Subscriber's data will never be lost, corrupted, or inaccessible. Subscriber shall maintain at least one (1) back-up copy of such materials and information to protect against accidental or other loss. SmartEtailing will endeavor to conform to applicable PCI-DSS security standards for credit card transactions and associated data.

## 7.9.

Subscriber shall be solely responsible for Subscriber Content, quality, performance, and all other aspects of the goods or services advertised, displayed, or offered for sale, and the information contained in or provided through Subscriber's Website.

## 7.10.

Subscriber shall keep all Subscriber information, including email address and credit card information, up to date and accurate as provided to SmartEtailing.

## 7.11.

(i) Subscriber shall not use the Subscriber Website or the SmartEtailing Services to post, transmit, display, distribute or promote any unlawful, threatening, abusive, libelous, defamatory, obscene, vulgar, offensive, pornographic, profane, racist, sexually explicit or indecent material of any kind; (ii) Subscriber shall not use the Subscriber Website or the SmartEtailing Services to encourage, promote, solicit or commit conduct that would constitute a criminal offense, give rise to civil liability or otherwise violate any local, state, national or international law; (iii) Subscriber shall not use the Subscriber Website or the SmartEtailing Services to post, transmit, display, distribute or promote in any way, information, software, or other material that violates, plagiarizes or infringes the rights of third parties including, without limitation, copyright (including, without limitation, offering pirated computer programs or links to such programs, information used to circumvent manufacturer-installed copy-protect devices, including serial registration numbers for software programs, or any type of cracker utilities), trademark, patent, trade secret, rights of privacy or publicity or any other proprietary right; (iv) Subscriber shall not use the Subscriber Website or the SmartEtailing Services to promote physical harm or injury against any group or individual; (v) Subscriber shall not use the Subscriber Website or the SmartEtailing Services to post, transmit, display, distribute or promote material that is exploitive of others; (vi) Except where approved by SmartEtailing in advance, Subscriber shall not use the Subscriber Website or the SmartEtailing Services to post, transmit, display, distribute, or promote material of any kind which constitutes requests for money, petitions for signature, or chain letters; (vii) Except where pre-approved by or provided by SmartEtailing, Subscriber shall not develop restricted or password-only access pages, or hidden pages or images (those not linked to from another accessible page); (viii) Subscriber shall not use the Subscriber Website or the SmartEtailing Services as storage for remote loading or as a door or signpost to another server; (ix) Subscriber shall not develop pages on the Subscriber Website that consist of hyperlinks to content or materials of any kind in violation of the restrictions contained in this Section 7.12; (x) Subscriber shall not restrict or inhibit any other user from using and enjoying the user's Subscriber Website or the SmartEtailing Services; (xi) Subscriber shall not use the Subscriber Website or the SmartEtailing Services to post, transmit, display, distribute or promote material of any kind that contains a virus or other harmful component; and (xii) Subscriber shall not use the Subscriber Website or the SmartEtailing Services to

post, transmit, display, distribute or promote information or material of any kind that constitutes or contains false or misleading indications of origin or statements of fact.

## 7.12.

SmartEtailing shall be under no obligation to monitor Subscriber's compliance with the terms and conditions of this Agreement, but SmartEtailing shall have the right to do so.

## 7.13.

Without limiting other remedies, SmartEtailing may restrict, suspend or terminate Subscriber's service and user accounts, prohibit access to Subscriber's website, remove hosted content, and take technical and legal steps to keep users off of the Subscriber Website if it is believed that Subscriber is creating problems, possible legal liabilities or acting inconsistently with the letter or spirit of Subscriber's responsibilities expressed in this Agreement.

## 8.0 SUBSCRIBER CONTENT

Subscriber acknowledges that Subscriber is solely responsible for the Subscriber Content and that SmartEtailing has no obligation under this Agreement for monitoring or verifying any information or materials included as part of the Subscriber Content. Notwithstanding the preceding sentence, SmartEtailing reserves the right at all times to disclose any Subscriber Content, in whole or in part, as necessary to satisfy any law, regulation or government request, or to edit, or remove any Subscriber Content, in whole or in part, that in the sole and exclusive discretion of SmartEtailing, are in violation of this Agreement. SmartEtailing reserves the right to remove the Subscriber Website from the SmartEtailing servers if the Subscriber Website, in whole or in part, and in the sole and exclusive discretion of SmartEtailing, is in violation of this Agreement.

## 9.0. SERVICE LEVEL GUARANTEE

SmartEtailing guarantees that the Subscriber Website shall operate properly 99% of the time during each calendar month. In the event the Subscriber Website fails to operate properly more than 1% of the time during a calendar month, and Subscriber reports such outage to SmartEtailing in writing within seven (7) days thereof, then SmartEtailing shall credit Subscriber a percentage of the monthly service fee equal to the difference between 99% and the percent of time during the calendar month that the Subscriber Website was operating properly. The credit shall be applied to the next monthly fee billing. This Guarantee shall not apply in the event of Force Majeure (Section 15.2), scheduled maintenance periods, an inability to access other applications or scripts running on the server, or if Subscriber's account is not in good standing at the time of the outage.

## 10.0. THIRD PARTY SERVICES

## 10.1.

In addition to this User Agreement, you also agree to be bound by the additional service-specific terms applicable to services you purchase from, or that are provided by, SmartEtailing's partners or other third parties.

## 10.2.

SmartEtailing may from time to time recommend, provide you with access to, or enable third party software, applications ("Apps"), products, services or website links (collectively, "Third Party Services") for your consideration or use. Such Third Party Services are made available only as a convenience, and your purchase, access or use of any such Third Party Services is solely between you and the applicable third party services provider ("Third Party Provider"). Any use by you of Third Party Services offered through the Services or SmartEtailing's Website is entirely at your own risk and discretion, and it is your responsibility to read the terms and conditions and/or privacy policies applicable to such Third Party Services before using them. In some instances, SmartEtailing may receive a revenue share from Third Party Providers that SmartEtailing recommends to you.

## 10.3.

We do not provide any warranties with respect to Third Party Services. You acknowledge that SmartEtailing has no control over Third Party Services and shall not be responsible or liable to anyone for such Third Party Services. The availability of Third Party Services on SmartEtailing's Websites or the integration or enabling of such Third Party Services does not constitute or imply an endorsement, authorization, sponsorship, or affiliation by or with SmartEtailing. SmartEtailing does not guarantee the availability of Third Party Services and you acknowledge that SmartEtailing may disable access to any Third Party Services at any time in its sole discretion and without notice to you. SmartEtailing is not responsible or liable to anyone for discontinuation or suspension of access to, or disablement of, any Third Party Service. SmartEtailing strongly recommends that you seek specialist advice before using or relying on Third Party Services, to ensure they will meet your needs. In particular, tax calculators should be used for reference only and not as a substitute for independent tax advice when assessing the correct tax rates you should charge to your customers.

## 10.4.

If you install or enable a Third Party Service for use with SmartEtailing, you grant us permission to allow the applicable Third Party Provider to access your data and to take any other actions as required for the interoperation of the Third Party Service with SmartEtailing, and any exchange of data or other interaction between you and the Third Party Provider is solely between you and such Third Party Provider. SmartEtailing is not responsible for any disclosure, modification or deletion of your data, or for any corresponding losses or damages you may suffer, as a result of access by a Third Party Service or a Third Party Provider to your data or other materials.

## 10.5.

Under no circumstances shall SmartEtailing be liable for any direct, indirect, incidental, special, consequential, punitive, extraordinary, exemplary or other damages whatsoever, that result from any Third Party Services or your contractual relationship with any Third Party Provider. These limitations

shall apply even if SmartEtailing has been advised of the possibility of such damages. The foregoing limitations shall apply to the fullest extent permitted by applicable law.

## 10.6

You agree to indemnify and hold us and (as applicable) our parent, subsidiaries, affiliates, SmartEtailing partners, officers, directors, agents, employees, and suppliers harmless from any claim or demand, including reasonable attorneys' fees, arising out of your use of a Third Party Service or your relationship with a Third Party Provider.

## 10.7

SmartEtailing does not design software releases to accommodate for unauthorized Third Party Services and is therefore not liable for ongoing functionality with software updates. Unauthorized Third Party Services may not be compatible with current or future functionality of your SmartEtailing website. Use of unauthorized Third Party Services may degrade the functionality of your SmartEtailing website.

## 11.0. DISCLAIMERS

The Internet is an international computer network of both government and non-government inter-operable packet switched data networks. The Internet is not owned, operated or managed by, or in any way affiliated with SmartEtailing or any of SmartEtailing's affiliates. SmartEtailing cannot and does not guarantee that the SmartEtailing Services will permit users or others access to the Subscriber Website or other Internet access that is sufficient to meet Subscriber's needs. Subscriber agrees that its use of the SmartEtailing Services and the Internet is solely at Subscriber's risk and is subject to all applicable local, state, national and international laws and regulations. SmartEtailing assumes no responsibility for any commercial transactions attempted or completed involving the SmartEtailing Services. SmartEtailing does not own or control all of the various facilities and communication lines through which access may be provided. Accordingly, SmartEtailing assumes no responsibility for the security of the Subscriber Website including, but not limited to user access. It is

SmartEtailing's policy to cooperate with law enforcement authorities and to notify such authorities if it suspects that Subscriber is engaged in illegal activities. Subscriber acknowledges and understands that anyone, including a minor, who has access to Subscriber's user identification and password, can also gain access to the SmartEtailing Services. Subscriber also acknowledges and agrees that (a) it is responsible for developing and maintaining procedures (apart from the SmartEtailing Services) to protect Subscriber Content, including making appropriate back-up copies of Subscriber Content; and (b) SmartEtailing is not responsible for backup and restoration of Subscriber Content. For the purposes of network maintenance, SmartEtailing may use, copy, display, store, transmit, translate, rearrange or reformat, view and distribute Subscriber Content to multiple domestic and international servers. Subscriber agrees that access to Subscriber Content will not prohibit or prevent SmartEtailing from developing or marketing any offering or product. SmartEtailing is not responsible for transmission errors, disclosure, erasure, or corruption of security of data or Subscriber Content.

## 12.0 SUBSCRIBER WARRANTIES

Subscriber represents and warrants that: (i) Subscriber owns, possesses or controls all right, title and interest to the Subscriber Content; (ii) Subscriber has the full and unrestricted right to enter into this Agreement and Subscriber has and shall maintain all rights in and to the Subscriber Content that are necessary to grant to SmartEtailing the rights granted in this Agreement; (iii) the Subscriber Content is true and accurate and does not and will not contain any misrepresentations of fact; (iv) the reproduction, licensing, use, publication, distribution, transmission, broadcast, or public exhibition, display, performance or digital performance of the Subscriber Content as authorized herein, and all other use thereof in accordance with this Agreement, does not and will not, (a) violate or infringe the civil, contract or property rights, copyrights, trademark rights, rights of privacy or publicity, or other rights of any person or entity, (b) constitute false or misleading indications of origin; (c) slander, libel or defame any person or entity; (d) cause injury of any kind to any person or entity; or (e) violate any applicable laws, rules, regulations or other governmental regulations; (v) Subscriber is at least eighteen (18) years old; (v) Subscriber has, and shall maintain, from the Effective Date of this Agreement through the termination or expiration of this Agreement, a valid SmartEtailing internet account registered in Subscriber's name; and (vi) this Agreement has been duly and validly entered into by Subscriber and constitutes the valid and binding agreement of Subscriber, enforceable against Subscriber in accordance with its terms.

## 13.0 SUBSCRIBER INDEMNIFICATION

Subscriber hereby agrees to indemnify, defend and hold harmless SmartEtailing, its subsidiaries and affiliates, its directors, officers, employees, information providers, agents, licensors and licensees ("Affiliates"), and defend any action brought against same with respect to any and all costs, claims, demands, liabilities, losses, damages, judgments, settlements, costs and expenses (including attorneys' fees), asserted by a third party (a "Third Party Claim"), arising out of or in connection with the Subscriber Content, Subscriber's operation of the Subscriber Website or any other acts by Subscriber in connection with Subscriber's use of the SmartEtailing Services and the SmartEtailing Proprietary Materials, including, without limitation: (i) any claim which if true, would constitute a breach of any of Subscriber's representations, warranties, covenants or agreements hereunder; (ii) claims arising from the negligence or willful misconduct of Subscriber; (iii) any actual or alleged infringement or violation of any patent, trademark, trade name, copyright, trade secret, license or any other third party contract or other right (including, but not limited to, misappropriation of trade secrets or violation of the right of publicity or privacy); (iv) claims for bodily injury (including death) and property damage; and (v) any claim for payment of compensation or salary asserted by an employee, subcontractor, agent or licensor of Subscriber. To the extent permitted by applicable law, Subscriber acknowledges and assumes all risk that the SmartEtailing Proprietary Materials, the SmartEtailing Services, or a portion of either, may infringe upon the patent or other proprietary rights of a third party, and acknowledges that such are provided "AS-IS". Subscriber specifically agrees to defend indemnify and hold SmartEtailing and its Affiliates harmless from any claim of infringement or violation of intellectual property rights related to Subscriber's use of the SmartEtailing Proprietary Materials or the SmartEtailing Services. SmartEtailing reserves for itself, at its own option, the exclusive right to settle, compromise and pay any and all claims, demands, proceedings, suits, actions or causes of actions which are brought against SmartEtailing herein under the terms and provisions of this Article and Subscriber shall in no event settle any such action without SmartEtailing's prior written consent. This entire Article 12 shall survive any expiration or termination of this Agreement.

## 14.0 LIMITATION OF LIABILITY

SUBSCRIBER AGREES THAT SMARTETAILING SERVICES ARE PROVIDED "AS IS" AND ON AN "AS AVAILABLE" BASIS.

SMARTETAILING'S LIABILITY TO SUBSCRIBER UNDER THIS AGREEMENT IS LIMITED TO THE SERVICE LEVEL GUARANTEE SET FORTH AT ARTICLE 9.0, ABOVE. SMARTETAILING DISCLAIMS ANY AND ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR ANY WARRANTY THAT SMARTETAILING SERVICES OR NETWORK TRANSPORT WILL BE UNINTERRUPTED OR ERROR FREE. IN NO EVENT SHALL SMARTETAILING OR ANY OTHER PARTY INVOLVED IN PROVIDING SERVICES UNDER THIS AGREEMENT BE LIABLE TO SUBSCRIBER OR ANY THIRD PARTY FOR ANY DIRECT, INDIRECT, SPECIAL, CONSEQUENTIAL PUNITIVE OR INCIDENTAL DAMAGES, INCLUDING WITHOUT LIMITATION, LOST PROFITS OR LOSS OR DAMAGE TO DATA ARISING OUT OF THE USE, PARTIAL USE OR INABILITY TO USE SMARTETAILING SERVICES, WHETHER ARISING IN CONTRACT OR IN TORT, OR RESULTING FROM THE FAULT OR NEGLIGENCE OF SMARTETAILING, EVEN IF SMARTETAILING HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. SMARTETAILING DOES NOT MONITOR OR EXERCISE CONTROL OVER THE SUBSCRIBER CONTENT OR THE INFORMATION RESIDING ON ITS WEB HOSTING SERVERS OR TRANSMITTED THROUGH ITS SYSTEM.

SMARTETAILING MAKES NO WARRANTY REGARDING ANY TRANSACTIONS EXECUTED THROUGH THE SMARTETAILING SERVICES, AND SUBSCRIBER UNDERSTANDS AND AGREES THAT SUCH TRANSACTIONS ARE CONDUCTED ENTIRELY AT SUBSCRIBER'S OWN RISK. THE FOREGOING DISCLAIMER SHALL APPLY TO THE FULLEST EXTENT PERMITTED BY LAW.

## 15.0 MODIFICATION OF AGREEMENT

SmartEtailing reserves the right, at its sole discretion, to modify, add, or remove any portion of this Agreement, in whole or in part, at any time. The most current version of this document will always be accessible from the administrative area of client's Website. Contact Support@SmartEtailing.com for further information. Subscriber agrees that it is Subscriber's responsibility to review Agreement with sufficient frequency to assure that Subscriber becomes aware in a timely manner of changes to this Agreement.

## 16.0 MISCELLANEOUS PROVISIONS

### 16.1. Entire Agreement.

This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and there are no representations, understandings or agreements that are not fully expressed in this Agreement.

### 16.2. Force Majeure, Etc.

Except for the payment of any monies due, if the performance of any part of this Agreement by either party is prevented, hindered, delayed or otherwise made impracticable by reason of any flood, riot, fire, judicial or governmental action, labor disputes, act of God, or any other cause beyond the control of that party, that party shall be excused from such to the extent that it is prevented, hindered or delayed by such cause.

### 16.3. No Assignment By Subscriber.

Subscriber shall not assign, without the prior written consent of SmartEtailing, its rights, duties or obligations under this Agreement to any person or entity, in whole or in part, whether by assignment, merger, transfer of assets, sale of stock, operation of law or otherwise, and any attempt to do so shall be deemed a material breach of this Agreement.

### 16.4. Notices.

Any notice provided pursuant to this Agreement, if specified to be in writing, shall be in writing and shall be delivered in the manner specified in the provision of this Agreement requiring or authorizing such notice or, if the provision of this Agreement requiring or authorizing such notice does not specify

the manner of delivering such notice, then notice by Subscriber to SmartEtailing shall be sent by United States Mail to the following address: SmartEtailing, Inc., 6707 Winchester Circle Suite 400, Boulder, CO 80301; and notice to SmartEtailing to Subscriber shall be either sent by United States Mail to the latest mailing address provided to SmartEtailing by Subscriber or by email to the latest email address provided to SmartEtailing by Subscriber, whichever method SmartEtailing shall choose.

## 16.5. Waiver.

The failure of SmartEtailing to partially or fully exercise any right or the waiver by SmartEtailing of any breach, shall not prevent a subsequent exercise of such right or be deemed a waiver of any subsequent breach of the same or any other term of this Agreement. Any cause of action Subscriber may have with respect to the SmartEtailing Services must be commenced within one (1) year after the claim or cause of action arises.

## 16.6. Severability.

If any provision of this Agreement is determined to be invalid under any applicable statute or rule of law, it is to that extent to be deemed omitted, and the balance of the Agreement shall remain enforceable.

## 16.7. Written Agreement.

The parties agree that this Agreement shall be deemed for all purposes, including any statute or law requiring agreements to be in writing, to be a written agreement, and neither party shall, in any action by the other party to enforce this Agreement, make any claim or defense that alleges this Agreement is other than a written agreement.

## 16.8. Governing Law.

This Agreement, and the provisions thereof, shall be governed by and construed in accordance with the laws of the State of Minnesota, without regard to its conflicts of laws rules.

## 16.9. Place of Contracting.

This Agreement is entered into for all purposes in the County of Hennepin, State of Minnesota.

## 16.10. Consent To Jurisdiction.

Subscriber hereby consents to the jurisdiction of the courts of the State of Minnesota over Subscriber and over the subject matter in any legal action brought by SmartEtailing or Subscriber to interpret or enforce any provision of this Agreement or resolve any other dispute between the parties involving or arising from this Agreement.

## 16.11. Costs and Attorneys' Fees.

In the event legal action is brought by either party to interpret or enforce any provision of this Agreement or resolve any other dispute between the parties involving or arising from this Agreement, the prevailing party in such action shall be entitled to recover its reasonable attorneys' fees from the other party.

Click "I Agree" to indicate your assent to this Agreement. "I Agree" to all of the terms and conditions of the foregoing SmartEtailing Web Hosting and Software License Agreement (the "Agreement"). I understand that the Agreement is a contract between me and SmartEtailing, Inc., and that I am legally bound by the provisions thereof

# EXHIBIT B

Begin forwarded message:

**From:** Paul Ribich <paul.r@smartetailing.com>
**Subject: Re: High dispute activity**
**Date:** June 22, 2020 at 12:10:13 PM MDT
**To:** Charles James <charles@crimsonbikes.com>

Hi Charles,

Thank you again for taking the time to speak with me. To recap our conversation:

1) Crimson Bike's overall rate of disputes is tracking well above the .08% threshold established by SE Payments/Stripe
2) The majority of these are related to customers not receiving the product ordered and not receiving a refund.
3) The manual capture (authorize then capture) option is a potential way to significantly reduce that type of dispute.
4) You'll continue to make the operational changes necessary to refund orders quickly when they cannot be fulfilled.
5) Beginning on July 1, 2020 your SE Payments fee will increase to 4.2% + $0.30 from 3.2% + 0.30 / transaction.
6) If the Crimson Bikes dispute rate does not decrease below the threshold (.08%) for the month of July, the rate will increase to 5.2% + 0.30 / transaction, effective August 1, 2020.
7) You have the opportunity to have your transaction fees returned to 3.2% + 0.30 / transaction. when the dispute rate remains below .08% for 2 consecutive months.

Please let me know if you have any questions.

Best,
Paul

Paul Ribich

Client Success Director at SmartEtailing | 303.532.1236
Read our Blog

Thursday, June 18, 2020 at 12:56:19 PM MDT, Paul Ribich <paul.r@smartetailing.com>:

1

Hi Charles,

The high rate of disputes on your account has continued since we last spoke. As of today, Crimson Bikes is tracking well above the maximum acceptable rate of .08%

Month-to-month(to date):1.92%
Month-to-previous month:4.6%
Last month total disputes: 44
This month-to-date disputes: 33 (21 of those transactions occurred after our conversation in May)

Please let me know if there is a good time to connect the next few days to discuss the next steps for your SE Payments account, or feel free to  schedule a meeting directly on my calendar.

Best,
Paul

On Mon, May 11, 2020 at 5:27 PM Paul Ribich < paul.r@smartetailing.com> wrote:

Hi Charles,

As of Friday morning, I had logged 13 disputes with a total charged amount of $9,015, against total volume of $491,756. There have been a few new disputes added to that since.

Thanks,
Paul

Paul Ribich
Client Success Director at SmartEtailing | 303.532.1236
Read our Blog

Monday, May 11, 2020 at 9:55:13 AM MDT, Paul Ribich <paul.r@smartetailing.com>:

Hi Charles,

I did a quick calculation of 1.83% based on a disputed dollar amount of the13 chargeback emails that we sent with the original charge date in the month of April. I think a couple more have come in since then.

Best,
Paul

On Sun, May 10, 2020 at 10:32 AM Charles T. James < charles@crimsonbikes.com> wrote:

Hi Paul,

Can you remind me what our current chargeback rate is? I remember a number like 1.6 percent but I can't recall exactly. How can i found out how many disputes we have had in total?

Best,
Charles


Founder,  CrimsonBikes
charles@crimsonbikes.com
(617) 909-6529


On Tue, May 5, 2020 at 4:07 PM Paul Ribich < paul.r@smartetailing.com> wrote:

Hi Charles,

We've noticed a high rate of disputed credit card charges on your account recently. Because the ratio of disputes to orders on your account is significantly higher than other merchants on the platform, we need to take steps to reduce it so that everyone's rate is not impacted.

A chargeback occurs when a customer's bank removes funds from your account for reasons such as suspected fraud, shipping issues, or return issues.

There are many things you can do to minimize chargeback risk including:

- Communicate clearly with customers about shipping progress and delivery windows
- Carefully review orders prior to fulfillment
- Immediately refund the customer when you cancel the order for any reason
- Use delivery tracking especially for high-value orders
- Monitor incoming communication and respond quickly to order questions and requests


If the dispute rate on your account does not decrease below the threshold set by our processing partners, the next steps may include a processing rate increase and potential account suspension or termination. Our goal is to prevent any of this from happening and work with you to reduce the number of disputes.

Please let me know if there is a good time to connect the next couple of days, or feel free to schedule a meeting directly on my calendar.

Best,
Paul


Paul Ribich
Client Success Director at SmartEtailing | 303.532.1236
Read our Blog


Begin forwarded message:

**From:** Paul Ribich <paul.r@smartetailing.com>

**Subject: Re: High dispute activity**
**Date:** June 18, 2020 at 12:56:19 PM MDT
**To:** Charles James <charles@crimsonbikes.com>

Hi Charles,

The high rate of disputes on your account has continued since we last spoke. As of today, Crimson Bikes is tracking well above the maximum acceptable rate of .08%

Month-to-month(to date):1.92%
Month-to-previous month:4.6%
Last month total disputes: 44
This month-to-date disputes: 33 (21 of those transactions occurred after our conversation in May)

Please let me know if there is a good time to connect the next few days to discuss the next steps for your SE Payments account, or feel free to schedule a meeting directly on my calendar.

Best,
Paul


On Mon, May 11, 2020 at 5:27 PM Paul Ribich <paul.r@smartetailing.com> wrote:

Hi Charles,

As of Friday morning, I had logged 13 disputes with a total charged amount of $9,015, against total volume of $491,756. There have been a few new disputes added to that since.

Thanks,
Paul

Paul Ribich
Client Success Director at SmartEtailing | 303.532.1236
Read our Blog


Monday, May 11, 2020 at 9:55:13 AM MDT, Paul Ribich <paul.r@smartetailing.com>:

Hi Charles,

I did a quick calculation of 1.83% based on a disputed dollar amount of the13 chargeback emails that we sent with the original charge date in the month of April. I think a couple more have come in since then.

Best,
Paul

On Sun, May 10, 2020 at 10:32 AM Charles T. James < charles@crimsonbikes.com> wrote:

Hi Paul,

Can you remind me what our current chargeback rate is? I remember a number like 1.6 percent but I can't recall exactly. How can i found out how many disputes we have had in total?

Best,
Charles


Founder,  CrimsonBikes
charles@crimsonbikes.com
(617) 909-6529


On Tue, May 5, 2020 at 4:07 PM Paul Ribich < paul.r@smartetailing.com> wrote:

Hi Charles,

We've noticed a high rate of disputed credit card charges on your account recently. Because the ratio of disputes to orders on your account is significantly higher than other merchants on the platform, we need to take steps to reduce it so that everyone's rate is not impacted.

A chargeback occurs when a customer's bank removes funds from your account for reasons such as suspected fraud, shipping issues, or return issues.

There are many things you can do to minimize chargeback risk including:

- Communicate clearly with customers about shipping progress and delivery windows
- Carefully review orders prior to fulfillment
- Immediately refund the customer when you cancel the order for any reason
- Use delivery tracking especially for high-value orders
- Monitor incoming communication and respond quickly to order questions and requests


If the dispute rate on your account does not decrease below the threshold set by our processing partners, the next steps may include a processing rate increase and potential account suspension or termination. Our goal is to prevent any of this from happening and work with you to reduce the number of disputes.

Please let me know if there is a good time to connect the next couple of days, or feel free to schedule a meeting directly on my calendar.

Best,
Paul


Paul Ribich
Client Success Director at SmartEtailing | 303.532.1236
Read our Blog

# **EXHIBIT C**

On Thu, Jul 30, 2020 at 7:12 PM, Paul Ribich

<paul.r@smartetailing.com> wrote:

Hi Charles,

As discussed, Crimson Bike's overall rate of disputes continues to track well above the .08% threshold established by SE Payments/Stripe. The frequency and volume of unsuccessful transactions from

crimsonbikes.com is negatively impacting the cost of payment processing for all SmartEtailing clients. For that reason, we need to help you transition off SE Payments/Stripe.

Authorize.net offers several features which I believe will serve your business well:

- Manual payment capture extending 30 days after payment has been authorized. This will give you the flexibility to accept reservations without the need to hold money for an extended period of time, reducing the frequency of refunds and disputes.

- The ability to choose a variety of payment processing providers, often with local banks that have a familiarity with your operations and individual business needs.

- Favorable rates and fees for dealers with significant sales volume.

To minimize the disruption to your business, we will keep SE Payments/Stripe active on your website until

**5:00 pm MTN on Monday, August 31st, 2020** while you switch gateways and make the necessary operational changes. Transfers will be delayed 7 days during the transition period.

We reserve the right to deactivate SE Payments/Stripe on your website before August 31s should we need to. If there is any way that you can make the switch faster, it would be appreciated.

Please find the attached spreadsheet with the Crimson Bikes' complete transaction history from January 1st through June 30, 2020.

Thank you for understanding our need to take this step. We look forward to helping you with your transition to an alternative payment gateway.

Please let me know if you have any questions.

**Paul Ribich**
Client Success Director at
SmartEtailing | 303.532.1236

# **EXHIBIT D**

**From:** Paul Ribich <paul.r@smartetailing.com>
**Subject: Re: SE Payments/Stripe**
**Date:** September 9, 2020 at 4:38:00 PM MDT
**To:** Charles James <charles@crimsonbikes.com>

Hi Charles,

I wanted to check-in to make sure that everything was functioning well for you after the change in processing providers. Hopefully, the disruptions caused by the change had minimal impact on your operations. Please let me know if you're experiencing any issues managing older transactions in SmartEtailing Payments/Stripe.

Thanks,
Paul

On Thu, Sep 3, 2020 at 2:26 PM Paul Ribich <paul.r@smartetailing.com> wrote:

Hi Charles,

This is a reminder that we will be deactivating SmartEtailing Payments for Crimson Bikes this afternoon.

It doesn't look like you currently have any alternative payment methods in place. To ensure that service isn't disrupted for your customers, please make sure that you have SmartEtailing Payments deactivated and an alternative enabled in SE Site Manager > Commerce > Payment Methods **before 7 PM EDT this afternoon**.

Please let me know if you have any questions.

Thanks,

Paul Ribich
Client Success Director at SmartEtailing | 303.532.1236
Read our Blog

On Mon, Aug 31, 2020 at 4:37 PM, Paul Ribich <paul.r@smartetailing.com> wrote:

Charles,

You're welcome. I'm glad we could find a way to help. Please keep me posted on your progress with the new processor.

Thanks,

1

Paul Ribich
Client Success Director at SmartEtailing | 303.532.1236
Read our Blog


On Mon, Aug 31, 2020 at 3:48 PM, Charles James <charles@crimsonbikes.com> wrote:

I can't say thank you enough on this one.

I appreciate the extension.

Best,
Charles

Founder,  CrimsonBikes
charles@crimsonbikes.com
(617) 909-6529


On Mon, Aug 31, 2020 at 5:42 PM Paul Ribich < paul.r@smartetailing.com> wrote:

Hi Charles,

We will be able to keep processing payments until **5:00 PM MDT on Thursday, September 3rd**. I can't stress enough that we will not be able to extend again past this date/time. I would suggest that you get PayPal enabled in advance, so you don't find yourself without a payment option should you need additional time to set up with the new processor.

Best,


Paul Ribich
Client Success Director at SmartEtailing | 303.532.1236
Read our Blog


On Mon, Aug 31, 2020 at 2:46 PM, Paul Ribich <paul.r@smartetailing.com> wrote:

Hi Charles,

Unfortunately, I can't give you an immediate answer to this. I'll need to do some checking to see if it's going to be possible to extend your ability to process into September.

Is there any possibility of pushing the new processor to activate your account prior to Friday? Have you considered PayPal as an interim solution?

Please hold tight and I'll let you know if we can work something out.

Thanks,

Paul Ribich

Client Success Director at SmartEtailing | 303.532.1236

Read our Blog

On Mon, Aug 31, 2020 at 1:10 PM, Charles James <charles@crimsonbikes.com> wrote:

Hi Paul,

We were able to find a new merchant service provider, but they will not be able to have us set up until Friday. Any chance we can be extended until EOD Thursday?

Best,
Charles

On Mon, Aug 31, 2020 at 2:51 PM Paul Ribich < paul.r@smartetailing.com> wrote:

Hi Charles,

I wanted to send you a reminder that we will be deactivating SmartEtailing Payments for Crimson Bikes this evening.

To avoid the possibility of missing sales, you'll want to turn off SmartEtailing Payments and have Authorize.net and/or PayPal activated on in SE Site Manager > Commerce > Payment Methods

**before 5 PM MDT this afternoon**.

Please let me know if you have any questions.

Thanks,

Paul Ribich

Client Success Director at SmartEtailing | 303.532.1236

Read our Blog

On Thu, Jul 30, 2020 at 7:12 PM, Paul Ribich

<paul.r@smartetailing.com> wrote:

Hi Charles,

As discussed, Crimson Bike's overall rate of disputes continues to track well above the .08% threshold established by SE Payments/Stripe. The frequency and volume of unsuccessful transactions from

crimsonbikes.com is negatively impacting the cost of payment processing for all SmartEtailing clients. For that reason, we need to help you transition off SE Payments/Stripe.

Authorize.net offers several features which I believe will serve your business well:

Manual payment capture extending 30 days after payment has been authorized. This will give you the flexibility to accept reservations without the need to hold money for an extended period of time, reducing the frequency of refunds and disputes.

- The ability to choose a variety of payment processing providers, often with local banks that have a familiarity with your operations and individual business needs.

- Favorable rates and fees for dealers with significant sales volume.

To minimize the disruption to your business, we will keep SE Payments/Stripe active on your website until

**5:00 pm MTN on Monday, August 31st, 2020** while you switch gateways and make the necessary operational changes. Transfers will be delayed 7 days during the transition period.

We reserve the right to deactivate SE Payments/Stripe on your website before August 31s should we need to. If there is any way that you can make the switch faster, it would be appreciated.

Please find the attached spreadsheet with the Crimson Bikes' complete transaction history from January 1st through June 30, 2020.

Thank you for understanding our need to take this step. We look forward to helping you with your transition to an alternative payment gateway.

Please let me know if you have any questions.

**Paul Ribich**

Client Success Director at

SmartEtailing | 303.532.1236

# **EXHIBIT E**

**From:** Paul Ribich <paul.r@smartetailing.com>
**Subject: Stripe / SmartEtailing Payments Account Issue**
**Date:** October 19, 2020 at 3:30:14 PM MDT
**To:** "Charles T. James" <charles@crimsonbikes.com>, CrimsonBikes Info <info@crimsonbikes.com>

Hi Charles,

It looks like Crimson Bikes has designated a new connected bank account in Stripe. There have been several failed attempts to access this new (Bank of America) connected account.

Please fund the connected account or designate a different account as soon as possible in order to resolve the negative balance in Stripe and to continue to fund customer refunds and disputes.

Best,
Paul


--

**Paul Ribich**
Client Success Director at SmartEtailing | 303.532.1236

# **EXHIBIT F**

## SmartEtailing Payments
### Flow of funds after Sept 28th 2020, when bank transfers failed



**Consumers of Crimsonbikes**

$687,713.33
Paid to consumers

Consumers are made whole by Platform regardless of the Connected account's ability to transfer funds.

**Platform account**
SMARTETAILING

($687,713.33)
Refunds & Chargebacks*

$687,713.33
Failed Payment

($2996.25)Stripe Fees

($13,527.54) Visa, MC, Amex, Disc Fees

($704,237.12)Net Loss**

**Connected account**
Crimson Bikes

($687,713.33)
Transfer (automatic)

Transfers Failed

Stripe provides code, infrastructure & compliance to facilitate payments

Transfers failed starting 9-28-20

**Connected account's Bank**

Bank of America   USD   Default
011000138 ···· 8204

($687,713.33)
Transfer (automatic)

Notes:

Platform: SmartEtailing
Connected Account: Crimsonbikes

*$318,645 in refunds were issued by Crimsonbikes using the SmartEtailing system prior to Oct 28th. The remaining balance is from chargebacks that were issued by consumers when they did not receive product that they had already paid money to Crimsonbikes for.

**Stripe holds funds from Platforms in reserve to cover losses of Connected Accounts. What this means is a Platform can not transfer funds that exceed it's balance less what's in the reserve. This keeps Stripe from having to cover these losses in the event a Connected Account becomes insolvent. This process is similar to how a traditional bank might not allow you to withdraw funds from a check deposit until that check clears.

Dollar amounts as of 5-5-2021, amount owed continues to increase daily.

# **EXHIBIT G**

# SmartEtailing

# Invoice

280 E 1st Avenue #1533
Broomfield CO 80038
United States
+1 303-527-0676
support@smartetailing.com

| Invoice number | F9E08899-0033 |
| --- | --- |
| Date of issue | Jan 1, 2021 |
| Date due | Jan 1, 2021 |

**Bill to**
Crimson Bikes
1001 Massachusetts Ave
Cambridge
MA
02138
United States
6179581727
info@crimsonbikes.org

# $394.00 due Jan 1, 2021

| Description | Qty | Unit price | Amount |
| --- | --- | --- | --- |
| JAN 1 – FEB 1, 2021 | | | |
| Professional Website Package | 1 | $499.00 | $499.00 |
| Supplier Fulfillment (All Cycling Suppliers) | 1 | $35.00 | $35.00 |
| | | Subtotal | $534.00 |
| | | Total | $534.00 |
| (F9E08899-0033-CN-01) 1 × Supplier Fulfillment (All Cycling Suppliers) (at $35.00 / month) — Other | -1 | $35.00 | -$35.00 |

Pay $394.00 with card
Visit **https://invoice.stripe.com/i/acct_1Bi63CI2kVEStRw9/invst_IgJDkrcie1bwhgjkAiNIzysWiyvUqmK**

Questions? Contact SmartEtailing at support@smartetailing.com or call at
+1 303-527-0676.

| | | | |
|---|---|---|---|
| (F9E08899-0033-CN-01) Supplier Fulfillment (October, November, December) — Other | -3 | $35.00 | -$105.00 |

| | |
|---|---|
| Adjustment subtotal | -$140.00 |
| Adjustment total | -$140.00 |
| Amount due | $394.00 |

**Pay $394.00 with card**
Visit **https://invoice.stripe.com/i/acct_1Bi63CI2kVEStRw9/invst_IgJDkrcie1bwhgjkAiNIzysWiyvUqmK**

**Questions?** Contact SmartEtailing at support@smartetailing.com or call at +1 303-527-0676.

# SmartEtailing

# Invoice

280 E 1st Avenue #1533
Broomfield CO 80038
United States
+1 303-527-0676
support@smartetailing.com

| | |
|---|---|
| Invoice number | **F9E08899-0040** |
| Date of issue | **Feb 2, 2021** |
| Date due | **Feb 2, 2021** |

**Bill to**
Crimson Bikes
1001 Massachusetts Ave
Cambridge
MA
02138
United States
6179581727
info@crimsonbikes.org

## $499.00 due Feb 2, 2021

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| FEB 1 – MAR 1, 2021 | | | |
| Professional Website Package | 1 | $499.00 | $499.00 |
| | | Subtotal | $499.00 |
| | | Amount due | $499.00 |

**Pay $499.00 with card**
Visit **https://invoice.stripe.com/i/acct_1Bi63CI2kVEStRw9/invst_IrvEbU90p06dTiviiPblY31iFh2YjtZ**

Questions? Contact SmartEtailing at support@smartetailing.com or call at
+1 303-527-0676.

# SmartEtailing

## Invoice

280 E 1st Avenue #1533
Broomfield CO 80038
United States
+1 303-527-0676
support@smartetailing.com

| | |
|---|---|
| Invoice number | **F9E08899-0042** |
| Date of issue | **Mar 2, 2021** |
| Date due | **Mar 2, 2021** |

**Bill to**
Crimson Bikes
1001 Massachusetts Ave
Cambridge
MA
02138
United States
6179581727
info@crimsonbikes.org

# $499.00 due Mar 2, 2021

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| MAR 1 – APR 1, 2021 | | | |
| Professional Website Package | 1 | $499.00 | $499.00 |
| | | Subtotal | $499.00 |
| | | Amount due | $499.00 |

Pay $499.00 with card
Visit **https://invoice.stripe.com/i/acct_1Bi63CI2kVEStRw9/invst_J2PY7fEfz8ku680VMNxeY37Amyjam4J**

Questions? Contact SmartEtailing at support@smartetailing.com or call at
+1 303-527-0676.

# SmartEtailing

Invoice

280 E 1st Avenue #1533
Broomfield CO 80038
United States
+1 303-527-0676
support@smartetailing.com

| | |
|---|---|
| Invoice number | **F9E08899-0044** |
| Date of issue | Apr 1, 2021 |
| Date due | Apr 1, 2021 |

**Bill to**
Crimson Bikes
1001 Massachusetts Ave
Cambridge
MA
02138
United States
6179581727
info@crimsonbikes.org

## $499.00 due Apr 1, 2021

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| APR 1 – MAY 1, 2021 | | | |
| Professional Website Package | 1 | $499.00 | $499.00 |
| | | Subtotal | $499.00 |
| | | Amount due | $499.00 |

Pay $499.00 with card
Visit **https://invoice.stripe.com/i/acct_1Bi63CI2kVEStRw9/invst_JE1YUqRFBnW4mjsj6aqo0sPZkhVysFv**

Questions? Contact SmartEtailing at support@smartetailing.com or call at
+1 303-527-0676.

# SmartEtailing

# Invoice

280 E 1st Avenue #1533
Broomfield CO 80038
United States
+1 303-527-0676
support@smartetailing.com

| | |
|---|---|
| Invoice number | **F9E08899-0046** |
| Date of issue | **May 1, 2021** |
| Date due | **May 1, 2021** |

**Bill to**
Crimson Bikes
1001 Massachusetts Ave
Cambridge
MA
02138
United States
6179581727
info@crimsonbikes.org

# $499.00 due May 1, 2021

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| MAY 1 – JUN 1, 2021 | | | |
| Professional Website Package | 1 | $499.00 | $499.00 |
| | | Subtotal | $499.00 |
| | | Amount due | $499.00 |

**Pay $499.00 with card**
Visit **https://invoice.stripe.com/i/acct_1Bi63CI2kVEStRw9/invst_JPGJr4itLI39MTPp4sPCoSMelREwU4s**

Questions? Contact SmartEtailing at support@smartetailing.com or call at
+1 303-527-0676.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### (Eastern Division)

In re:

CRIMSONBIKES, LLC,

               Alleged Debtor.

Involuntary Chapter 7

Case No. 21-10278

## DECLARATION RE: ELECTRONIC FILING

### PART I – DECLARATION OF AFFIANT

      I, David P. Wert, hereby declare under penalty of perjury that all of the information contained in the foregoing **Affidavit** (the "Document"), filed electronically, is true and correct. I understand that this DECLARATION is to be filed with the Clerk of Court electronically concurrently with the electronic filing of the Document. I understand that failure to file this DECLARATION may cause the Document to be struck and any request contained or relying thereon to be denied, without further notice.

      I further understand that pursuant to the Massachusetts Electronic Filing Local Rule (MEFR) 7(b), all paper documents containing original signatures executed under the penalties of perjury and filed electronically with the Court are the property of the bankruptcy estate and shall be maintained by the authorized CM/ECF Registered User for a period of five (5) years after the closing of this case.

Dated:   May 18, 2021

Signed: _____

David P. Wert

## PART II – DECLARATION OF ATTORNEY

I certify that the affiant signed this form before I submitted the Document, I gave the affiant a copy of the Document and this DECLARATION, and I have followed all other electronic filing requirements currently established by local rule and standing order. This DECLARATION is based on all information of which I have knowledge and my signature below constitutes my certification of the foregoing under Fed. R. Bankr. P. 9011. I have reviewed and will comply with the provisions of MEFR 7.

Dated: May 19, 2021                Signed: _____
                                   Lynne B. Xerras
                                   (Counsel to SmartEtailing, Inc.)

#52157372_v1

- 2 -